May it please the court. I certainly appreciate the time you've given us here this morning. My name is David Trussell from Little Rock, Arkansas. I represent the appellant Renee Toland. This case today involves some very familiar issues to Social Security litigation, but just because they're familiar does not mean they're not important. In listening to some of the arguments as I sat in the courtroom today, some of the anecdotes, I began to think about, I've been doing this type of work for 22 years and one of the things I've enjoyed is, and been proud of, is the 8th Circuit has some of the most well, the body of Social Security laws, some of the most well developed of just about any circuit. It provides consistency, it provides predictability. If you don't know what's going to happen in a court case, it's involves the treating physician rule. The general rule for decades has been that a well-supported opinion by a treating physician that has the support of a longitudinal record of treatment, including also with the support of diagnostic and clinical findings, should be entitled to substantial weight. In fact, in many circumstances where it's that compelling, should be controlling weight. In this case, we have exactly that type of opinion. The court's case law regarding the exceptions to that rule are also well developed. And in this particular case, the ALJ purported to provide little weight to the opinion of a treating pain management specialist who completed an assessment of Ms. Tolan's functional restrictions after he had been seeing her for over 18 months, over a period where he had seen her for about 12 visits each time, noting the abnormal results of his physical exams, where he's treating her with Dilaudid, methadone, powerful narcotics. And interestingly enough, that particular physician has been the subject of an 8th Circuit case. In the Perks case, that same physician who completed the assessment for our claimant had provided similar treatment to another claimant who had responded well to the treatment and then came to Dr. Buchaya Garlapati, came to Dr. Garlapati and asked for a letter to help support his disability claim. And Dr. Garlapati refused. Well, he did not. You know how it's worded. It's worded rather odd. Instead of writing the letter, he recommended that the Well, my interpretation of that is, he recommended a functional capacity evaluation. What that indicates to me is that he did not want to provide an opinion regarding restrictions to that particular individual without more. It's much easier to say, I need more information than it is to say to a current patient, I really can't help you with your case. But I guess the moral of the story is that, I guess it goes to show that Dr. Garlapati is not someone who's just trying to a person just because they happen to be in treatment with them. In this case, the other critical issue, other than whether there's adequate reasons to discredit Dr. Garlapati's opinion, is timing. We have a date last insured of October of December of 2008. The original alleged onset date was, I believe, January of 2007. That was amended. We moved it to the time she actually stopped working in December of 2007. But that's with respect to the Title II claim. There's about a year window between December of 2007 and December of 2008, where she must be found disabled with the evidence that's available during that time to be eligible for Title II. But that does not prevent a consideration of her Title XVI claim. And unfortunately, the judge does not seem to make any distinction between the two claims in his decision. And many of the criticisms he offers, even though they are inadequate for the Title II claim, certainly don't apply to the Title XVI claim because there's evidence of worsening. In our brief, we note that the critical date is August 28th of 2008. That is just over three months prior to the date last insured. That is where her treating doctor, Dr. Cobb, a family began describing her back and leg pain as severe, indicates the urgency of her getting an MRI and epidural steroid injections that she can't afford. And he refers her to Dr. Garlapati, who doesn't see her until February 2009, two months after her date last insured. We certainly believe that there is adequate evidence to indicate that even if she was not that clear. And of course, we pointed this out at the hearing as a suggestion to the judge, and that was just never really touched upon in the decision. Now, what's interesting is the judge also says a couple of things. It's one thing to have reasons. It's another thing to give reasons that are not correct. For instance, one of the reasons he gave for discrediting Dr. Garlapati was that at no time had any physician indicated that she was disabled. Now, first of all, we know if we got a doctor to say that, they would say that that was an alternate opinion reserved for the commissioner, and that wouldn't be evidence of anything. But apparently, but I don't have a dog and my dog didn't bite you. But in this case, Dr. Cobb, in August of 2008, actually it was in that follow-up visit in February, he said she will need to apply for disability. Now, I don't know how to interpret that other than the doctor, it doesn't sound like something that she brought up with him. He knew she was unemployed and he knew she had had a worsening. So that sort of undercuts the judge's reasoning there. The other issue involved these vague references to her having some continued work activity. The bottom line is the ALJ found that there was no substantial gainful activity at the alleged onset date. The issues of her continuing to try to work in her landscape business come up, if at all, in early 2008, before the worsening time that I described, where Dr. Cobb is counseling her, you can't do those things anymore. The only other references to other work are some vague references about how she hadn't been able to take care of her clients the previous winter, or she was supposedly going to a garden center, work at a garden center, for which there was no record of any earnings. So as I've drawn near my last three minutes here, the issue here really comes down to if you have all of the elements that are required for controlling weight, if you have a longitudinal relationship with multiple visits where there is clinical findings at each visit of abnormality, and then you also have the objective diagnostic, you have the strong pain medications, and then a detailed assessment with notes that are supported internally, in that doctor's opinion, and with her family doctor with whom he had the referral relationship, I'm still wondering what evidence is there other than the consultative exam that the ALJ would have somehow come up with an alternative conclusion. I really believe that he spent a lot of time focusing on that additional work effort, and it bothered him. But evidence of I don't know how to address that other than just with the facts we have. The district court suggested that perhaps that Dr. Garlapati's RFC restrictions were only slightly more than the ALJ found. Well, the problem is they may have been only slightly more, but they would have been enough for a VE to determine that she was disabled. So when it changes the outcome of the case, I have a hard time characterizing something as slight, and I think I'm down to a minute and a half. As a matter of fact, if it's all right with the court, I'll just go ahead and complete my remarks now. Let me ask you this. Just jumping forward, the ALJ ultimately found that she could do the job of a food checker or a ticket taker. Why is that unreasonable on this record? Well, her specific impairment, for which she takes methadone, Dilaudid, Flexeril, involves low back pain with radicular symptoms that extend down into her hip. Dr. Garlapati's assessment clearly indicated that she would have trouble even sitting for as much as two hours on an eight-hour workday, which is required for most any sedentary job. And then he also indicated she would be required to in the hypothetical question to the vocational expert. So therefore, I mean, I can state with confidence that I've never had a case with those restrictions where somebody was found able to do any work, but we're sort of left to speculate because the ALJ had not presented those impairments because he had improperly discredited the testimony of the opinions of a treating specialist. Um, what about the, um, the medication issue and whether the pain that you've described could be handled by the medications? How do you think that that was treated properly? I think that what you have is, is obviously common sense tells you that if you have that degree of medication, if you have that much, uh, uh, one of the issues I mentioned earlier about the dog, there used to be a judge who would find that there was no evidence that the claimant, uh, uh, didn't take strong pain medication, uh, that she took strong pain medication. And if she did, there's no evidence that it didn't help. Well, in this case, as compared to the perks decision, what you see is repeated failure of the therapy. Uh, uh, the pain medicine gets to, she's taking all the strongest pain medication that's available and it's still chronic pain, uh, without relief. Whereas in perks, Dr. Garlapati treated the person and said they responded well. So no, I don't, I think there are a lot of other issues besides just the specific restrictions that could be presented to a VE, uh, further developed, but, uh, I just feel like that where we stand. The ALJ said the pain was controlled and yet your doctor, treating doctor said on eight different occasions, it was uncontrolled. That's correct judge. So what, I guess that's just that the ALJ is not believing the doctor. And I don't know how to explain that other than, uh, the, the, the, if we just look at the lineup, there are DDS physicians who didn't see most of this evidence early on in the case. And then there's the one report of a consultative examiner, Dr. Hungerin, who was the one discredited in the, uh, whose opinion was discredited in the perks case. Uh, and, uh, he, he gives her pretty significant limitations, but just gives the ALJ just enough to hang his hat on to, to provide the RFC to the, to the, to the VE. And I just don't see, I don't see how one consultative examination when compared to the, I don't see how that could be substantial. You're repeating yourself now and your time's up. Certainly. Thank you. Thank you. Okay. You're going to have to help me with your name. How do you pronounce it? Ajez. Ajez. Ajez. Yes, sir. Okay. Well, good morning. Morning, Your Honor. And may it please the court. My name is Hasan Ajez and I'm here today representing Carolyn Colvin, Acting Commissioner of the Social Security Administration. Um, first I'd like to address some of the issues that came up in the prior, uh, presentation. Regarding the ticket seller hypothetical, the ALJ's hypothetical actually specifically addressed the sit-stand option. The, um, he asked the question whether or not a individual with claimant's residual functional capacity assessment, a hypothetical person, would be able to do that job because the job is listed in the DOT as light work. And so the ALJ inquired about this apparent discrepancy. Um, the vocational expert testified that the ticket seller or ticket taker position would be capable of being performed by such an individual because they would have a stool with them in the booth that would allow them to sit and stand at their will. So the ALJ's hypothetical actually said being able to sit, uh, stand 30 minutes at a time than requiring a 30 minute break. But the vocational expert's, um, statement supported an individual who is even more impaired than that because they could sit and stand at will. Um, and actually I think that brings up a point that there's not much daylight between Dr. Garlapati's medical source statement, which took form of a checklist opinion, and the ALJ's decision. Really, ultimately the, the difference, um, aside from the environmental limitations which didn't come up in the briefing, which I'll address later, but really the difference is Dr. Garlapati's opinion that Ms. Tolan would be capable of standing and sitting, uh, standing and walking for less than two hours in an eight hour workday and sitting for less than six hours in an eight hour workday, which just necessarily means that she couldn't complete an eight hour workday since all those don't total up to eight hours. Whereas the ALJ found that Ms. Tolan was capable of performing less than the full range of sedentary work. That is to say that she would be capable of sitting for six hours, standing and walking for two hours. And again, that's with a sit-stand option that she was not capable of lifting overhead with the right arm. Um, so there's really not an enormous amount of difference with Dr. Garlapati's opinion. However, the ALJ noted that it was inconsistent with the objective medical evidence with Ms. Tolan's work activities and with Ms. Tolan's activities of daily living. The issues of... Yeah, the ALJ said that she lived a fairly active lifestyle. What supports that? Um, it seems to me she was saying she wasn't. Go ahead. What, what supports that finding? Yes, Your Honor. Both her statements in her function report as well as statements she made to treating physicians that appear in the record. Um, these include activities such as driving, shopping, sweeping, gardening, yard work, mopping floors, and traveling to the Northeastern United States. Um, regarding her work activity, um, there was an issue regarding the date last insured and these different application dates. Essentially, one time period is from the date, uh, her alleged onset date through her date last insured. That's essentially December 2007 till, uh, December 2008. And then the other time period for her Title VI, that one is for Title II. Title XVI runs from her application date, the protective filing date, which was, uh, October 2009 through the date of the ALJ's decision, which was July 6, 2011. So even taking the later date, um, which is October 2009 through 2011, Ms. Tolan's work activities, uh, contradicted Dr. Gallipotti's opinion. The ALJ noted, and specifically weighing Dr. Gallipotti's opinion, that Ms. Tolan was working part-time at a garden center as late as June 2010. In December 2010, she had plans to rent a booth at a local mall to sell items at. Um, there was some issue regarding her earnings. Um, there's a statement that there's no evidence of any earnings. And the ALJ did state that there was insufficient evidence to determine whether her work constituted substantial gainful activity. However, that was made at step one of the sequential evaluation process. Had Ms. Tolan's work earnings constituted SGA, which is in essence, had her monthly earnings risen above a certain threshold, then she would have been found not disabled regardless of her medical condition. The ALJ found that the evidence was insufficient to make such a determination. And so we continue through the sequential evaluation process. When he was specifically evaluating Dr. Gallipotti's opinion, and it's important to note that he did specifically evaluate it, consider it, give well-supported evidence, um, finding that it deserved little weight and provided record evidence for those reasons. And so when considering Dr. Gallipotti's weight, he noted that, um, it was contradictory to a work activity, but he didn't raise the SGA issue at that point because it wasn't relevant to the inquiry. How much he earned wasn't really relevant to whether her activity, her function was inconsistent with Dr. Gallipotti's opinion. And when she's working part-time at a garden center, it was. The second point that Ms. Tolan raised is that these statements specifically regarding the work after August, 2009 were unsupported. However, the ALJ statement came directly from treatment notes from Janet Standard, a psychologist that Ms. Tolan went to. On her June 10th, 2010 treatment notes, she specifically stated that Ms. Tolan is currently working part-time at a garden center. So the ALJ's use of Ms. Tolan's work activity to evaluate Dr. Gallipotti's opinion was both proper and well-supported. What about the issue of pain management, the medication issue? Do you feel that the ALJ's conclusion was supported by the evidence that was introduced? Yes. Yes, I do believe so, Your Honor. Dr. Gallipotti, he stated as late as August, 2010, that Ms. Tolan's current medications are controlling her pain adequately. And at the last two times that Dr. Gallipotti saw Ms. Tolan, he simply refilled her medications without any change in what she was taking or the dosage levels, indicating that her pain was actually being controlled. There was some prior issues before when Ms. Tolan first came to be seen at Arkansas Pain Center. However, so Dr. Tolan, he did a methadone taper, and then he introduced Dilaudid, and so there was some adjustment period when he initially began seeing her. But towards the end of her treatment, the last two times he saw her, he didn't change her dosage or what she was taking. And he stated, again, in August, 2010, that her current pain medications were controlling it adequately. What is the relevant time we look at here? Because there is a timeline with her pain. Regarding the Title II claim, which is the disability DIB, that is from December 2007 to December 2008. And regarding her Title XVI claim, the relevant time period is October 2009 through July 6, 2011, the date of the ALJ's decision. So for Title II, she has to be in insured status. So it goes from alleged onset date to when she was last insured. And then Title XVI is her protective filing date, all the way up until the ALJ's decision. And there's evidence throughout this time period that Ms. Tolan's work activities were inconsistent with Dr. Tolan's opinion. And in fact, Dr. Gallipotti's opinion was also inconsistent with his own treatment records. For example, he stated in the checklist opinion that Ms. Tolan medically required a handheld assistive device to ambulate. Though she was seen at Arkansas Pain Center 13 times, not one of the treatment notes indicate that she was ever using such a device. 12 of the 13 notes actually affirmatively state that she was not using such a device. This assisted device need noted in his medical source statement? Is that what it's in? Or is it in some other document? In his medical source statement. Okay. Do you know where it is in there? I have trouble reading it or have it handy? 520 to 523 of the record? Yes, Your Honor. It is. Nobody's deciphered the handwriting anyplace, have they? That's right. It's on the first page, 520. The very last checkbox that's checked. Oh. So it was a checkmark. I was trying to read the writing. So it's a checkmark. Yes, Your Honor. It's definitely difficult sometimes with these doctors. No, no, no. But it's just a checkmark. That's the checkmark that says medically required handheld. Okay. Thank you. You're welcome, Your Honor. And Dr. Gallipotti never explained for why he never prescribed such a device, given his belief that he felt one was medically necessary. How long was he her physician? I believe it was he initially performed, my notes show August 2009 through December 2010. That last visit, he actually didn't see Dr. Gallipotti. He saw another physician at Arkansas Pain Center. And then Dr. Gallipotti's checklist form was issued on March 2011. So about five months after Dr. Gallipotti's signature last appeared on any treatment notes from Arkansas Pain Center. And there's no evidence of any deterioration or anything between that last visit and his medical source statement. Regarding the Perks case, I'll try and finish up with that in the time allotted. First, there's no, Ms. Tolan has not presented any legal authority suggesting that the course conduct of a physician in one case is relevant and should be used to evaluate that physician's opinion in a completely separate case. The facts are dissimilar. That case involved a letter simply stating that the claimant was disabled. Here, what's at issue is a checklist opinion. Well, it does show he's not a rubber stamp, right? And Your Honor, I believe that the Perks case actually supports the opposite conclusion. In Perks, Dr. Gallipotti recommended that the claimant stop working. And he also expressed evaluations about writing a letter without a functional capacity evaluation. Here, Dr. Gallipotti never recommended that Ms. Tolan stop working. And there's no reason why he didn't have those same reservations since there's no functional capacity evaluation done here. And lastly, Your Honor, I'd just like to note that the issue, the ultimate issue, is whether substantial evidence supports the ALJ's decision. Dr. Gallipotti's opinion was unsupported, contradictory to objective medical evidence, Ms. Tolan's work activities, and the Commissioner respectfully asks this Court to affirm. Thank you. Thank you.